UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JAMIE KRYGER,

        Plaintiff,                                  Hon. Ellen S. Carmody

v.

                                           Case No. 1:13-cv-685

COMMISSIONER OF
SOCIAL SECURITY,

        Defendant.
_____/

## **OPINION**

This is an action pursuant to Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), to review a final decision of the Commissioner of Social Security denying Plaintiff's claim for Disability Insurance Benefits (DIB) under Title II of the Social Security Act. On September 11, 2013, the parties agreed to proceed in this Court for all further proceedings, including an order of final judgment. (Dkt. #13).

Section 405(g) limits the Court to a review of the administrative record and provides that if the Commissioner's decision is supported by substantial evidence it shall be conclusive. The Commissioner has found that Plaintiff is not disabled within the meaning of the Act. For the reasons stated below, the Court concludes that the Commissioner's decision is supported by substantial evidence. Accordingly, the Commissioner's decision is **affirmed**.

## **STANDARD OF REVIEW**

The Court's jurisdiction is confined to a review of the Commissioner's decision and of the record made in the administrative hearing process. *See Willbanks v. Sec'y of Health and Human Services*, 847 F.2d 301, 303 (6th Cir. 1988). The scope of judicial review in a social security case is limited to determining whether the Commissioner applied the proper legal standards in making her decision and whether there exists in the record substantial evidence supporting that decision. *See Brainard v. Sec'y of Health and Human Services*, 889 F.2d 679, 681 (6th Cir. 1989).

The Court may not conduct a de novo review of the case, resolve evidentiary conflicts, or decide questions of credibility. *See Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). It is the Commissioner who is charged with finding the facts relevant to an application for disability benefits, and her findings are conclusive provided they are supported by substantial evidence. *See* 42 U.S.C. § 405(g).

Substantial evidence is more than a scintilla, but less than a preponderance. *See Cohen v. Sec'y of Dep't of Health and Human Services*, 964 F.2d 524, 528 (6th Cir. 1992) (citations omitted). It is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *See Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Bogle v. Sullivan*, 998 F.2d 342, 347 (6th Cir. 1993). In determining the substantiality of the evidence, the Court must consider the evidence on the record as a whole and take into account whatever in the record fairly detracts from its weight. *See Richardson v. Sec'y of Health and Human Services*, 735 F.2d 962, 963 (6th Cir. 1984).

As has been widely recognized, the substantial evidence standard presupposes the existence of a zone within which the decision maker can properly rule either way, without judicial

interference.  *See Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (citation omitted).  This standard affords to the administrative decision maker considerable latitude, and indicates that a decision supported by substantial evidence will not be reversed simply because the evidence would have supported a contrary decision.  *See Bogle*, 998 F.2d at 347; *Mullen*, 800 F.2d at 545.

## PROCEDURAL POSTURE

Plaintiff was 26 years of age on her alleged disability onset date.  (Tr. 164).  She possesses a tenth grade education and previously worked as a cashier and customer service representative.  (Tr. 30).  Plaintiff applied for benefits on June 22, 2009, alleging that she had been disabled since October 4, 2008, due to spinal fracture, tendonitis, rib fractures, and anxiety.  (Tr. 164-70, 203).  Plaintiff's application was denied, after which time she requested a hearing before an Administrative Law Judge (ALJ).  (Tr. 105-61).  On September 6, 2011, Plaintiff appeared before ALJ Craig Petersen with testimony being presented by Plaintiff, Plaintiff's roommate, and a vocational expert.  (Tr. 45-104).  In a written decision dated October 20, 2011, the ALJ determined that Plaintiff was not disabled.  (Tr. 19-31).  The Appeals Council declined to review the ALJ's determination, rendering it the Commissioner's final decision in the matter.  (Tr. 1-5).  Plaintiff initiated this pursuant to 42 U.S.C. § 405(g), seeking judicial review of the ALJ's decision.

## RELEVANT MEDICAL HISTORY

On September 29, 2003, Plaintiff was involved in an automobile accident in which she experienced the following injuries: (1) bilateral C2 pedicle fracture; (2) transverse process fracture at T7-T8; and (3) multiple rib fractures.  (Tr. 380).  Plaintiff suffered "no neurologic

3

involvement," however, and a CT scan of her head was "normal." (Tr. 380). Plaintiff remained at Spectrum Health Butterworth Hospital until October 3, 2003, at which point she was transferred to Mary Free Bed Hospital where she remained until October 15, 2003. (Tr. 385). Plaintiff successfully completed therapy at Mary Free Bed although it was noted that Plaintiff was "inconsistent with performance." (Tr. 370-74).

On February 9, 2004, Plaintiff was examined by Dr. Sampson Ho. (Tr. 382-83). A physical examination revealed the following:

> When I saw her today on clinical examination, there was no sensory deficit noted in upper and lower extremities. She also demonstrated symmetrical range of motion in the upper extremities. Muscle testing was noted to have no muscle weakness. In the lower extremities she was able to walk without support. She was able to walk on tiptoes and heels, squat and recovery. Deep tendon reflexes in both lower extremities again were symmetrical. Plantar reflexes were downgoing.

(Tr. 382).

Mary Free Bed treatment notes dated March 29, 2004 indicate that Plaintiff "appears to be appropriate for independent driving at this time" and that "there are no further driver rehabilitation concerns at this time." (Tr. 375).

On February 14, 2007, Plaintiff participated in a CT scan of her head the results of which were "normal." (Tr. 490). A CT scan of Plaintiff's cervical spine, completed the same day, revealed that Plaintiff's C2 pedicle fractures were "well healed." (Tr. 702). The prevertebral soft tissues were "normal" and there was no evidence of acute fracture. (Tr. 702).

On July 1, 2008, Plaintiff reported to the emergency room complaining of back pain. (Tr. 402-03). A physical examination revealed the following:

> Vital signs - temperature 35, heart rate 99, respiratory rate 18, blood pressure 119/75, and pulse oximetry is 99% on room air. Constitution/psych - the patient is a well-nourished, well-developed female who appears her stated age.  She is breathing without difficulty.  She is talking in complete sentences.  Respiratory - lungs are clear to auscultation with good air exchange throughout. Cardiovascular - S1 and S2 are auscultated with regular rate and rhythm.  No murmurs, rubs, or gallops appreciated.  Abdomen - bowel sounds are present and it was soft, nontender, nondistended with no rebound, no guarding, no peritoneal signs.  Back - there is no thoracic or lumbar spine tenderness.  She had negative straight leg raise.  She has no paraspinal muscle tenderness.  She has no CVA tenderness.  Skin was warm and moist.  Musculoskeletal exam - the patient has 5/5 strength in her lower legs.  Dorsalis pedal pulses are present bilaterally.  Neuro examination - the patient neurovascularly intact for peroneal and tibial nerves bilaterally.  Gait and station were normal.

(Tr. 402).  Plaintiff was provided pain medication and "discharged home in stable condition." (Tr. 402-03).

On October 3, 2008, Plaintiff was examined by Physician's Assistant William Brinkmeier.  (Tr. 567-68).  Plaintiff reported that "she continues to struggle with neck pain and mid back pain." (Tr. 567).  A physical examination revealed the following:

> She is cooperative, but appears a bit flat.  She has 2/4 and symmetric deep tendon reflexes in the biceps, triceps and brachioradialis.  There is mild pain with flexion of the cervical spine and increased pain with extension leading to pain radiating up her left occiput.  Spurling's[1] to the left is negative; Spurling's to the right is negative.  Hoffmann's[2] is negative.  There is mild pain with thoracic rotation on the right. Cranial nerves two through 12 are grossly intact.

---

[1] A positive Spurling's test suggests the presence of a cervical nerve root disorder.  Thomas W. Woodward, M.D., and Thomas M. Best, M.D., Ph.D., *The Painful Shoulder: Part I Clinical Evaluation*, American Family Physician, May 15, 2000, *available at*, http://www.aafp.org/afp/20000515/3079.html (last visited September 22, 2014).

[2] Hoffman's sign is an indicator of a number of neurological conditions including cervical spondylitis, other forms of spinal cord compression, and multiple sclerosis.  *See* Hoffman's Sign, available at, http://www.mult-sclerosis.org/Hoffmanssign.html (last visited on September 22, 2014).

(Tr. 567).

On February 2, 2009, Plaintiff participated in a consultive examination conducted by Kathryn Kendall, Ph.D. (Tr. 417-22). Plaintiff reported that she was unable to work due to the combination of "severe pain in her ribs, neck and back" as well as "anxiety and panic attacks." (Tr. 418). Plaintiff reported she last worked in October 2008 when "she was fired for tardiness, an unexcused absence and poor performance." (Tr. 419). The results of a mental status examination were unremarkable. (Tr. 420-21). Plaintiff was diagnosed with mood disorder and panic disorder without agoraphobia. (Tr. 421). Her GAF score was rated as 50.[3] (Tr. 421).

On February 27, 2009, Kenneth Kobes completed a Psychiatric Review Technique form regarding Plaintiff's mental limitations. (Tr. 434-47). Determining that Plaintiff suffered from mood disorder, panic disorder without agoraphobia, and chronic pain syndrome, Kobes concluded that Plaintiff satisfied the Part A criteria for Sections 12.04 (Affective Disorders), 12.06 (Anxiety-Related Disorders), and 12.07 (Somatoform Disorders) of the Listing of Impairments. (Tr. 435-43). Kobes determined, however, that Plaintiff failed to satisfy any of the Part B criteria for these particular Listings. (Tr. 444). Specifically, Kobes concluded that Plaintiff experienced moderate restrictions in the activities of daily living, moderate difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence or pace, and never experienced extended episodes of decompensation. (Tr. 444).

Kobes also completed a Mental Residual Functional Capacity Assessment form

---

[3] The Global Assessment of Functioning (GAF) score refers to the clinician's judgment of the individual's overall level of functioning. American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 32 (4th ed. 1994) (hereinafter DSM-IV). A GAF score of 50 indicates that the individual is experiencing "serious symptoms or any serious impairment in social, occupational, or school functioning." DSM-IV at 34.

6

regarding Plaintiff's limitations in 20 separate categories encompassing (1) understanding and memory, (2) sustained concentration and persistence, (3) social interaction, and (4) adaptation. (Tr. 430-31). Plaintiff's abilities were characterized as "moderately limited" in seven categories. (Tr. 430-31). With respect to the remaining 13 categories, however, Kobes reported that Plaintiff was either "not significantly limited" or that there existed "no evidence of limitation." (Tr. 430-31).

On April 13, 2009, Plaintiff was examined by Dr. Michael Grof. (Tr. 606-22). Plaintiff reported that she was continuing to experience headaches. (Tr. 606). In reviewing the medical record the doctor observed that Plaintiff reported being involved in two subsequent automobile accidents in May 2006 and February 2007. (Tr. 607). When the doctor discussed this matter with Plaintiff, however, "she admits that she did not have an accident but made that up to a treating physician for the purpose of obtaining more studies." (Tr. 607). Specifically, Plaintiff stated that "I told my orthopedic doctor I was in an accident so he would give me an MRI." (Tr. 607). Plaintiff reported that her "orthopedic doctor had recommended injections into her neck to help with the residual problem she was having but she talked to friends and they have mixed experiences with some definitely warning her against getting any injection, so she refused this form of treatment." (Tr. 607). Plaintiff also reported that she goes to the emergency room to obtain Vicodin prescriptions. (Tr. 608). Plaintiff exhibited "full range of motion" in her neck and a physical examination was otherwise unremarkable. (Tr. 609). A neurological examination was likewise unremarkable. (Tr. 609). With respect to his diagnosis and prognosis for Plaintiff, Dr. Grof reported the following:

> Diagnoses: 1) Status post history C2 fracture which has sufficiently healed.  2) Chronic migraine cephalgia unrelated to motor vehicle accident.  3) Chronic muscle tension headaches with cervical

> paraspinal muscle dystonia related to the motor vehicle accident causing occipital neuralgia and chronic occipital headaches.
>
> Prognosis for Ms. Kryger is excellent from a neurological standpoint. As far as pain treatment goes, I would think that she could do better, but she also is reported in these records to not be the most compliant patient and not always following the advice of the physicians. If she was to work closely with the physician, directing multiple modes of therapy for her muscle tension problem and occipital neuralgia, I think she could be markedly improved making her prognosis for subjective complaints better. However, neurologically objectively, I do not find anything abnormal in her and there is no prognosis therefore warranted.

(Tr. 621).

On May 7, 2009, Plaintiff was examined by Physician's Assistant Brinkmeier. (Tr. 501). Plaintiff reported "that her neck, left side, as well as her left ribs continues to be problematic." (Tr. 501). Plaintiff rated her pain as 7 out of 10. (Tr. 501). A physical examination revealed the following:

> She is alert, cooperative, presents in a straightforward manner. She has 2/4 symmetric deep tendon reflexes biceps, triceps, brachioradialis bilaterally. She has 5/5 strength in intrinsics, wrist extensors, biceps, triceps. Flexion of her cervical spine was negative. Mild pain with extension. Spurling's[4] was negative. Thoracic rotation provided left lateral rib pain.

(Tr. 501).

On June 30, 2009, Plaintiff reported that physical therapy was "helping" and that was experiencing a decrease in the "incidence/intensity" of her headaches. (Tr. 653).

On July 16, 2009, Dr. James Ellis reported that Plaintiff could return to work subject

---

[4] A positive Spurling's test suggests the presence of a cervical nerve root disorder. Thomas W. Woodward, M.D., and Thomas M. Best, M.D., Ph.D., *The Painful Shoulder: Part I Clinical Evaluation*, American Family Physician, May 15, 2000, *available at*, http://www.aafp.org/afp/20000515/3079.html (last visited on September 23, 2014).

to the following limitations: (1) no lifting over 20 pounds; (2) no "over chest" reaching; and (3) no work above shoulders or below waist. (Tr. 566).

On January 5, 2010, Lisa Story, Ph.D. completed a Psychiatric Review Technique form regarding Plaintiff's mental limitations. (Tr. 677-90). Determining that Plaintiff suffered from mood disorder, depressive disorder, depression with anxiety, and panic disorder without agoraphobia, the doctor concluded that Plaintiff satisfied the Part A criteria for Sections 12.04 (Affective Disorders) and 12.06 (Anxiety-Related Disorders) of the Listing of Impairments. (Tr. 678-86). The doctor determined, however, that Plaintiff failed to satisfy any of the Part B criteria for these particular Listings. (Tr. 687). Specifically, the doctor concluded that Plaintiff experienced mild restrictions in the activities of daily living, moderate difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence or pace, and never experienced extended episodes of decompensation. (Tr. 687).

Dr. Story also completed a Mental Residual Functional Capacity Assessment form regarding Plaintiff's limitations in 20 separate categories encompassing (1) understanding and memory, (2) sustained concentration and persistence, (3) social interaction, and (4) adaptation. (Tr. 691-93). Plaintiff's abilities were characterized as "moderately limited" in eight categories. (Tr. 691-92). With respect to the remaining 12 categories, however, the doctor reported that Plaintiff was either "not significantly limited" or that there existed "no evidence of limitation." (Tr. 691-92). Dr. Story concluded that Plaintiff "retains the ability to perform simple, repetitive tasks on a sustained basis without extraordinary accommodations." (Tr. 693).

On April 28, 2011, Plaintiff participated in a functional capacity assessment performed by Dawn Kropf with Mary Free Bed. (Tr. 818-21). Kropf concluded that Plaintiff was

9

"capable of performing physical work within the light strength classification" subject to the following limitations: (1) she can sit "up to two hours at any given time"; (2) her ability to stand is "unlimited"; (3) she can walk "up to one hour at any given time"; (4) she can occasionally bend, rotate her trunk, squat/crouch, crawl, climb stairs, reach overhead, and perform "static forward bending"; (5) she can frequently reach forward, reach to the side, perform "firm" grasping maneuvers, turn, and bend forward and backward; (6) she can occasionally lift 25 pounds from floor to waist, 20 pounds from waist to shoulder, 10 pounds overhead, and carry 30 pounds; and (7) she can constantly perform "simple" grasping activities. (Tr. 820-21).

On June 15, 2011, Plaintiff was again examined by Dr. Grof. (Tr. 712-25). Plaintiff reported that she "cannot tolerate any pain" and was experiencing "a very difficult time learning to adapt to her new lifestyle." (Tr. 712). Plaintiff reported that she is "afraid to do almost anything that would aggravate the pain including sweeping or any chores around the house." (Tr. 713). Plaintiff conceded that she could perform these activities, but asserted that if she did so, she "will be in the hospital for three days." (Tr. 713). With respect to this comment by Plaintiff, the doctor observed:

> When I asked her what she meant by being in the hospital for three days, she states that last weekend she was in the med center the whole weekend. This, of course, was an exaggeration on her part because as I got more detail about it, she went to the med center on Saturday night. She states that Friday she did a lot of activity. Saturday morning she started developing pain and headache. She tolerated this until 6:00 pm Saturday and then went to a med center. She was hoping to get more Vicodin because she had run out and she got a little bit. However, she states that she did not get much treatment there. She thought about going back on Sunday, she states, but she decided not to and that it would not be worth it.

(Tr. 712-13).

The doctor reported the results of a physical examination as follows:

10

> My examination finds basically full range of motion, totally normal neurological examination. An EMG objectively supports the fact that she does not have any true weakness or her motor unit recruitment would be abnormal. Any neurophysiological physician, who performs frequent EMG testing, can tell whether a patient has true weakness based on the muscle motor unit pattern when the individual is asked to actively flex a muscle. All findings were normal in the report. There are no objective findings for any of her complaints. However, this must be viewed in the light of the fact that pain is always a subjective complaint and there is no objective test that can determine whether or not she is having pain.

(Tr. 724).

With respect to whether Plaintiff has "reached maximum medical improvement," Dr. Grof reported the following:

> Yes, she has reached maximum medical improvement but not maximum psychological improvement. There is no neuromuscular or neurological problem that she has. She could fully return to work with no restrictions at this time regarding that modality.

(Tr. 724-25).

As for Plaintiff's prognosis, the doctor reported the following:

> The prognosis is extremely poor. This is because of the mentation of the patient. The types of complaints and injuries she had are not all that uncommon and are clearly seen in medical practices of most physicians. The majority of individuals with this type of disorder who heal their fractures normally work with the pain, get over it, accept some pain in life and go on and lead the best life that they can. This individual states she will not tolerate any pain. She also refused a lot of medical treatment that was offered that would have been very helpful early on. Some of the medical treatment being done now probably helps more than she admits, according to the records of Dr. Rahimi, but she is clearly at a state now where she has very much invested in not having to return to work and not having to do any type of physical activity, by her own admission. Therefore, the chances regarding improvement to normal physical activity is so slim in this patient mainly because I have the opinion she does not want to even though she has the neuromuscular physical ability to. This gives her

a very poor prognosis.

(Tr. 723).

On August 30, 2011, Dr. Ramin Rahimi completed a physical capacities assessment regarding Plaintiff's abilities. (Tr. 852-53). The doctor reported that Plaintiff can "sometimes," defined as "1-2 hours in an 8-hour workday," sit, stand/walk, lift 10 pounds, bend, reach over shoulder, grasp, stoop, push/pull, and climb stairs. (Tr. 852). The doctor reported that Plaintiff can "never" lift up to 25 pounds, squat, crawl, or kneel. (Tr. 852). The doctor also reported that Plaintiff would experience "serious limitations as to pace and concentration" and needed a sit-stand option. (Tr. 852). The doctor also reported that Plaintiff "would likely miss 3 days or more of work and be tardy 3 or more days per month" and that she was "best suited for part-time work" because full-time work "would not accommodate [her] limitations." (Tr. 852).

## **ANALYSIS OF THE ALJ'S DECISION**

The social security regulations articulate a five-step sequential process for evaluating disability. *See* 20 C.F.R. §§ 404.1520(a-f), 416.920(a-f).[5] If the Commissioner can make a

---

[5] 1. An individual who is working and engaging in substantial gainful activity will not be found to be "disabled" regardless of medical findings (20 C.F.R. 404.1520(b));

2. An individual who does not have a "severe impairment" will not be found "disabled" (20 C.F.R. 404.1520(c));

3. If an individual is not working and is suffering from a severe impairment which meets the duration requirement and which "meets or equals" a listed impairment in Appendix 1 of Subpart P of Regulations No. 4, a finding of "disabled" will be made without consideration of vocational factors (20 C.F.R. 404.1520(d));

4. If an individual is capable of performing work he or she has done in the past, a finding of "not disabled" must be made (20 C.F.R. 404.1520(e));

5. If an individual's impairment is so severe as to preclude the performance of past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if other work can be performed (20 C.F.R. 404.1520(f)).

dispositive finding at any point in the review, no further finding is required. *See* 20 C.F.R. §§ 404.1520(a), 416.920(a). The regulations also provide that if a claimant suffers from a nonexertional impairment as well as an exertional impairment, both are considered in determining his residual functional capacity. *See* 20 C.F.R. §§ 404.1545, 416.945.

The burden of establishing the right to benefits rests squarely on Plaintiff's shoulders, and she can satisfy her burden by demonstrating that her impairments are so severe that she is unable to perform her previous work, and cannot, considering her age, education, and work experience, perform any other substantial gainful employment existing in significant numbers in the national economy. *See* 42 U.S.C. § 423(d)(2)(A); *Cohen*, 964 F.2d at 528. While the burden of proof shifts to the Commissioner at step five, Plaintiff bears the burden of proof through step four of the procedure, the point at which her residual functioning capacity (RFC) is determined. *See Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987); *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997) (ALJ determines RFC at step four, at which point claimant bears the burden of proof).

The ALJ determined that Plaintiff suffered from: (1) cervicalgia arising out of a cervical spine fracture status post motor vehicle accident; (2) thoracic spine compression fracture; (3) rib pain status post fractures; (4) mood disorder; (5) panic disorder without agoraphobia; and (6) migraine headaches, severe impairments that whether considered alone or in combination with other impairments, failed to satisfy the requirements of any impairment identified in the Listing of Impairments detailed in 20 C.F.R., Part 404, Subpart P, Appendix 1. (Tr. 21-23).

With respect to Plaintiff's residual functional capacity, the ALJ determined that Plaintiff retained the capacity to perform light work subject to the following limitations: (1) she can occasionally lift/carry 20 pounds and can frequently lift/carry 10 pounds; (2) she can occasionally

push/pull 10 pounds; (3) she can stand/walk for 6 hours during an 8-hour workday; (4) she can sit for 6 hours during an 8-hour workday; (5) she can occasionally stoop, kneel, crouch, crawl, and climb ramps/stairs; (6) she can never climb ladders, ropes, or scaffolds; (7) she cannot perform lifting from ground to waist level on a repetitive basis; (8) she cannot perform repetitive bending or twisting activities of the lumbar or cervical spine; (9) she cannot perform overhead work; (10) she must avoid concentrated exposure to cold or wetness; (11) she has no visual or communication limitations; (12) she is limited to work involving simple, routine, and repetitive tasks; (13) she is limited to work involving simple work-related decisions and few, if any, workplace changes; and (14) she can only occasionally interact with co-workers, supervisors, and the public. (Tr. 23).

The ALJ determined that Plaintiff could not perform her past relevant work, at which point the burden of proof shifted to the Commissioner to establish by substantial evidence that a significant number of jobs exist in the national economy which Plaintiff could perform, her limitations notwithstanding. *See Richardson*, 735 F.2d at 964. While the ALJ is not required to question a vocational expert on this issue, "a finding supported by substantial evidence that a claimant has the vocational qualifications to perform <u>specific</u> jobs" is needed to meet the burden. *O'Banner v. Sec'y of Health and Human Services*, 587 F.2d 321, 323 (6th Cir. 1978) (emphasis added). This standard requires more than mere intuition or conjecture by the ALJ that the claimant can perform specific jobs in the national economy. *See Richardson*, 735 F.2d at 964. Accordingly, ALJs routinely question vocational experts in an attempt to determine whether there exist a significant number of jobs which a particular claimant can perform, his limitations notwithstanding. Such was the case here, as the ALJ questioned a vocational expert.

The vocational expert testified that there existed in the state of Michigan

approximately 20,000 jobs which an individual with Plaintiff's RFC could perform, such limitations notwithstanding. (Tr. 99-100). This represents a significant number of jobs. *See Born v. Sec'y of Health and Human Services*, 923 F.2d 1168, 1174 (6th Cir. 1990); *Hall v. Bowen*, 837 F.2d 272, 274 (6th Cir. 1988); *Martin v. Commissioner of Social Security*, 170 Fed. Appx. 369, 374 (6th Cir., Mar. 1, 2006).

I.         **The ALJ Properly Assessed the Medical Evidence**

As noted above, Dr. Rahimi reported that Plaintiff can only "sometimes" sit, stand/walk, lift 10 pounds, bend, reach over shoulder, grasp, stoop, push/pull, and climb stairs. The doctor reported that Plaintiff can "never" lift up to 25 pounds, squat, crawl, or kneel. The doctor reported that Plaintiff would experience "serious limitations as to pace and concentration" and "would likely miss 3 days or more of work and be tardy 3 or more days per month." The ALJ afforded "little weight" to Dr. Rahimi's opinion. Plaintiff argues that she is entitled to relief because the ALJ improperly discounted the opinions from her treating physician. Plaintiff further argues that the ALJ improperly credited other evidence of record.

The treating physician doctrine recognizes that medical professionals who have a long history of caring for a claimant and his maladies generally possess significant insight into his medical condition. *See Barker v. Shalala*, 40 F.3d 789, 794 (6th Cir. 1994). An ALJ must, therefore, give controlling weight to the opinion of a treating source if: (1) the opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and (2) the opinion "is not inconsistent with the other substantial evidence in the case record." *Gayheart v. Commissioner of Social Security*, 710 F.3d 365, 375-76 (6th Cir. 2013) (quoting 20 C.F.R. § 404.1527).

15

Such deference is appropriate, however, only where the particular opinion "is based upon sufficient medical data." *Miller v. Sec'y of Health and Human Services*, 1991 WL 229979 at *2 (6th Cir., Nov. 7, 1991) (citing *Shavers v. Sec'y of Health and Human Services*, 839 F.2d 232, 235 n.1 (6th Cir. 1987)). The ALJ may reject the opinion of a treating physician where such is unsupported by the medical record, merely states a conclusion, or is contradicted by substantial medical evidence. *See Cohen*, 964 F.2d at 528; *Miller v. Sec'y of Health and Human Services*, 1991 WL 229979 at *2 (6th Cir., Nov. 7, 1991) (citing *Shavers v. Sec'y of Health and Human Services*, 839 F.2d 232, 235 n.1 (6th Cir. 1987)); *Cutlip v. Sec'y of Health and Human Services*, 25 F.3d 284, 286-87 (6th Cir. 1994).

If an ALJ accords less than controlling weight to a treating source's opinion, the ALJ must "give good reasons" for doing so. *Gayheart*, 710 F.3d at 376. Such reasons must be "supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." This requirement "ensures that the ALJ applies the treating physician rule and permits meaningful review of the ALJ's application of the rule." *Id.* (quoting *Wilson v. Commissioner of Social Security*, 378 F.3d 541, 544 (6th Cir. 2004)). Simply stating that the physician's opinions "are not well-supported by any objective findings and are inconsistent with other credible evidence" is, without more, too "ambiguous" to permit meaningful review of the ALJ's assessment. *Gayheart*, 710 F.3d at 376-77.

If the ALJ affords less than controlling weight to a treating physician's opinion, the ALJ must still determine the weight to be afforded such. *Id.* at 376. In doing so, the ALJ must consider the following factors: (1) length of the treatment relationship and frequency of the

16

examination, (2) nature and extent of the treatment relationship, (3) supportability of the opinion, (4) consistency of the opinion with the record as a whole, (5) the specialization of the treating source, and (6) other relevant factors. *Id.* (citing 20 C.F.R. § 404.1527). While the ALJ is not required to explicitly discuss each of these factors, the record must nevertheless reflect that the ALJ considered those factors relevant to his assessment. *See, e.g., Oldham v. Astrue*, 509 F.3d 1254, 1258 (10th Cir. 2007); *Undheim v. Barnhart*, 214 Fed. Appx. 448, 450 (5th Cir., Jan. 19, 2007).

In discounting Dr. Rahimi's opinion, the ALJ correctly observed that the doctor's opinion was inconsistent with his treatment notes. (Tr. 28, 774-809). The ALJ also noted that while Dr. Rahimi opined that Plaintiff suffered from the aforementioned limitations since October 4, 2008, Plaintiff did not begin treatment with Dr. Rahimi until several years later. (Tr. 28). As the ALJ concluded, such naturally calls into question the doctor's opinion. Finally, the ALJ observed that Dr. Rahimi's opinion was inconsistent with the medical evidence of record. As the discussion above indicates, this conclusion is supported by substantial evidence. In sum, the ALJ's conclusion to afford less than controlling weight to Dr. Rahimi's opinions is supported by substantial evidence.

Plaintiff next argues that the ALJ improperly credited the opinions of Ms. Kropf as well as agency evaluators "who never examined" Plaintiff. As the Sixth Circuit has recognized, once an ALJ properly determines that the opinion of a treating physician is not entitled to controlling weight, the ALJ may consider the opinions of non-treating and non-examining sources. *See Gayheart v. Commissioner of Social Security*, 710 F.3d 365, 376 (6th Cir. 2013); *see also*, 20 C.F.R. § 404.1527 (recognizing that the ALJ may rely on the opinions of non-treating and non-examining sources).

As noted above, Dawn Kropf conducted a functional capacity assessment, concluding

17

that Plaintiff was "capable of performing physical work within the light strength classification" subject to certain limitations. The ALJ afforded "significant weight" to Kropf's opinion on the ground that such "is supported by objective testing and adequate explanations." (Tr. 28-29). The ALJ also afforded "significant weight" to the State agency physicians and consultants on the ground that such were "consistent with the evidence of record as a whole." (Tr. 27). These determinations are consistent with the aforementioned authority and are supported by substantial evidence. Accordingly, this argument is rejected.

Finally, Plaintiff argues that because the opinions offered by the State agency physicians and consultants were unsigned, the ALJ improperly relied on such. The Court discerns no error, however, as all the documents in question have electronic signatures. (Tr. 408-15, 430-47, 669-94). This argument is, therefore, rejected.

## CONCLUSION

For the reasons articulated herein, the Court concludes that the ALJ's decision is supported by substantial evidence. Accordingly, the Commissioner's decision is **affirmed**. A judgment consistent with this opinion will enter.

Date: September 24, 2014         /s/ Ellen S. Carmody
                                 ELLEN S. CARMODY
                                 United States Magistrate Judge